IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 15, 2020

## ZAKKAWANDA ZAWUMBA MOSS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lincoln County**
**No. 13-CR-63PC    Forest A. Durard, Jr., Judge**

———————————————————

### No. M2019-00972-CCA-R3-PC

———————————————————

The Petitioner, Zakkawanda Zawumba Moss, appeals the Lincoln County Circuit Court's denial of his post-conviction petition, seeking relief from his six convictions of first degree premediated murder and six consecutive life sentences. On appeal, the Petitioner contends that we should remand the case to the post-conviction court in order to provide the Petitioner an opportunity to present additional proof in support of his petition. Based upon the record and the parties' briefs, we disagree with the Petitioner and affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Matthew J. Crigger (on appeal), Brentwood, Tennessee, and M. Wesley Hall, IV (at hearing), Unionville, Tennessee, for the appellant, Zakkawanda Zawumba Moss.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Robert James Carter, District Attorney General; and Ann L. Filer, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On October 22, 2012, four bodies were discovered in Fayetteville in Lincoln County. State v. Zakkawanda Zawumba Moss, No. M2014-00746-CCA-R3-CD, 2016 WL 5253209, at *1 (Tenn. Crim. App. at Nashville, Sept. 21, 2016), perm. app. denied, (Tenn. Jan. 19, 2017). Twenty-one-year-old Amber McCaulley; twenty-two-year-old Chabreya Campbell; and sixteen-month-old Rashad Ragland, Jr., who was Campbell's son, were

found in Campbell's home on Huntsville Highway. Id. Twenty-one-year-old Jessica Brown was found in Brown's home on Foxwood Drive. Id. McCaulley had been shot in the head; Campbell and Brown had been bound with their hands behind their backs and strangled; and Ragland's skull had been broken into multiple pieces. Id. at *14. Campbell was in her third trimester of pregnancy at the time of her death. Id. at *15. The next day, the body of Warren Crutcher was found off a farm road in Madison County, Alabama. Id. at *1. He had been shot three times in the back of the head. Id. at *15.

In May 2013, the Petitioner and Henry Burrell were indicted separately for six counts of first degree premediated murder. Id. at *1. At the Petitioner's trial, the State presented the following evidence: Crutcher and McCaulley were dating in October 2012. See id. at *4. Crutcher had had romantic relationships with Campbell and Brown as well, and he had a son with Campbell and a son with Brown.[1] Id. at *2, 3. Crutcher was living with Brown on Foxwood Drive at the time of the killings, but he also was known to stay at the house on Huntsville Highway. Id. at *3, 4. Crutcher, D'Carlos Joiner, and Burrell were in the business of selling illegal drugs together. Id. at *3. According to Joiner, who was in jail at the time of the killings, Crutcher was "the leader" of the business, Joiner was his "right hand man," and Burrell was "'a robber.'" Id. Joiner testified that he and Crutcher hid their drugs in the houses on Huntsville Highway and Foxwood Drive but did not conduct business there. Id. at *4. Burrell knew the drugs were in the two houses but did not know exactly where the drugs were hidden, and only Crutcher, Joiner, and Burrell knew where Crutcher and Joiner lived. Id. Joiner said that he and Crutcher were planning to start a legitimate business and that Burrell was not included in their plans. Id. Joiner explained to the jury that "'hit a lick'" meant to rob someone and that "'the lick'" was the target of the robbery. Id. at *3.

Asia Towles, who often babysat Campbell's two sons, testified that she met the Petitioner through Crutcher about two weeks before the victims were killed. Id. at *5. Towles recalled an incident in which she arrived at Campbell's home and saw Crutcher, Burrell, and the Petitioner "'standing in a circle talking.'" Id. Towles also saw money, "'dope,'" and guns on a table and saw Crutcher "'hand out money'" to Burrell and the Petitioner. Id.

Angelee Hill, Burrell's girlfriend, testified that two or three days before the crimes, she overheard Burrell tell someone on the telephone that he was going to rob Crutcher. Id. On October 21, 2012, Hill saw Burrell get into the Petitioner's car and leave with him. Id. About 11:00 p.m., Burrell telephoned Hill and told her to pick him up at an apartment

---

[1] Brown and Crutcher's seven-week-old son was found alive in a bathroom of the Foxwood Drive house, and Campbell's and Crutcher's young son was found unharmed in the Huntsville Highway house. Id. at *1, 5.

complex in Huntsville.  Id.  When Hill arrived, she picked up Burrell and the Petitioner, and they told her to drive to Walmart.  Id. at *5, 6.  The Petitioner went inside but returned about five minutes later and told Burrell that "'it wouldn't work.'"  Id. at *6.  Hill then drove to a Wavaho gas station where she witnessed the Petitioner try to use a bank card at an ATM.  Id.  The name on the card was "'Warren Crutcher.'"  Id.  The next day, Hill and Burrell picked up the Petitioner at the Petitioner's home in Alabama and drove to Burrell's sister's apartment in Huntsville.  Id.  When they arrived, Hill saw blood on the "'back hatch'" of her Jeep.  Id.  Lillie Burrell, Henry Burrell's sister, testified that Hill had an anxiety attack at her apartment and that Hill, Henry Burrell, and the Petitioner were acting unusual.  Id. at *9.  Lillie Burrell saw the Petitioner with a black bag, and Henry Burrell and the Petitioner were looking inside the bag.  Id.

After the killings, the police developed the Petitioner and Henry Burrell as suspects.  Id. at *12.  On October 24, 2012, the police interviewed the Petitioner, and he claimed that he did not know Burrell.  Id.  In a second interview two days later, the Petitioner claimed that he had been in a "drug operation" with Burrell and Crutcher for six to eight weeks, that Burrell "thought [Burrell] was being 'cut out of the group,'" and that the Petitioner thought Burrell was responsible for the killings.  Id. at *12.

The State presented forensic evidence linking the Petitioner to the Huntsville Highway house.  That evidence included the Petitioner's fingerprint on a beer bottle that was in a trash can outside the home, bloody shoe prints inside the home and garage that were consistent with a pair of shoes the Petitioner was seen wearing on the day of the crimes, and DNA on beer bottles in the home that were consistent with the Petitioner's DNA.  Id. at *15, 16.  Additionally, blood was found inside Hill's Jeep on the passenger side.  Id. at *17.  McCaulley's and Crutcher's blood was found inside a white Hyundai Elantra that Crutcher was known to drive, and the Petitioner could not be excluded as a contributor to touch DNA that was found on the car's front interior passenger-side door handle.  Id.  Touch DNA on the Petitioner's cellular telephone matched McCaulley.  Id.

The State also presented text messages sent from a cellular telephone purportedly belonging to the Petitioner.  On the evening of the crimes, a text message to "'WB'" said, "'We gonna lick'" and "'Wit da lick.'"  Id.  Another text message to WB said, "'That's why I try to shack 'dem.'"  Id.  An investigator for the district attorney's office testified that "'hitting a lick'" meant committing a robbery.  Id.  The investigator also testified, over the Petitioner's objection, that he had never heard of the phrase "shack 'dem" but that "shake 'em down" referred to intimidating a person out of his or her drugs without committing a robbery.  Id.

Finally, the State introduced cellular telephone location data into evidence.  The data showed that Crutcher's, the Petitioner's, and Burrell's cellular telephones were in the

- 3 -

area of the Huntsville Highway house on the afternoon of October 21. See id. at *18. About 10:30 p.m., all three telephones were in Huntsville, Alabama. Id. By 1:30 a.m. on October 22, Crutcher's and the Petitioner's telephones were back in the area of the Huntsville Highway house. Id. However, at 2:07 a.m., the Petitioner's telephone was in an area of Huntsville, Alabama, where Crutcher's bloody Elantra was later found by police. Id.

The Petitioner did not present any proof, and the jury convicted him of six counts of first degree premeditated murder as charged in the indictment. Id. The trial court sentenced the Petitioner to life for each conviction and ordered that he serve the sentences consecutively. Id. On appeal of his convictions to this court, the Petitioner claimed that the evidence was insufficient to support the convictions; that the trial court erred by refusing to allow the jury to view a video-recorded forensic interview of Crutcher's and Campbell's son, who was three or four years old at the time of the interview; that the trial court improperly admitted the testimony of four witnesses, including Angelee Hill and the investigator who testified about "'shake 'em down'"; that the trial court should have granted his requests for a mistrial; that the trial court improperly admitted prejudicial and cumulative photographs into evidence; and that the trial court improperly instructed the jury. See id. at *18-27.

This court affirmed the Petitioner's convictions. Id. at *28. Regarding the sufficiency of the evidence, this court summarized the State's theory of the crimes and the evidence supporting that theory, stating,

> During closing arguments, the State explained its theory of the killings as follows: Henry Burrell and the [Petitioner] planned to rob Warren Crutcher. On the night of October 21, 2012, Crutcher and Amber McCaulley went to Crutcher's mother's house. Burrell and the [Petitioner] were together in Huntsville, and Burrell telephoned Crutcher. After receiving the call, Crutcher and McCaulley left Crutcher's mother's house in the white Elantra and went to pick up Burrell and the [Petitioner]. The four of them left Huntsville in the Elantra with Burrell or the [Petitioner] driving, Crutcher sitting in the front passenger seat, Burrell or the [Petitioner] sitting behind Crutcher, and McCaulley sitting behind the driver. They drove to the Huntsville Highway house. When the car pulled into the garage, whoever was sitting behind Crutcher shot him in the back of the head three times. The killer then shot McCaulley in the head. The [Petitioner] and Burrell pulled McCaulley out of the back seat, dragged her into the utility room, and put a piece of plywood over the doorway to conceal her body. The two men then went inside, bound Chabreya Campbell's hands behind her back, and dunked her head in a bathtub of water to try to get her to reveal where Crutcher kept

- 4 -

his drugs and money. When Campbell was unwilling or unable to tell them, they strangled her. After killing Campbell, they stomped the sixteen-month-old Ragland to death. Burrell and the [Petitioner] then drove the Elantra, with Crutcher's body still inside, to the Foxwood Drive residence where they killed Jessica Brown in the same manner that they had killed Campbell. After killing Brown, Burrell and the [Petitioner] ransacked the house, looking for money and drugs. They took drugs from one or both houses, and the [Petitioner] took Crutcher's AK-47s from the Foxwood Drive home. Burrell and the [Petitioner] intended to "pin" the killings on Crutcher, so they spared the lives of his two children and disposed of his body in the woods on BH Reeves Road in Alabama. Afterward, they drove the car to the Overlook Apartments, telephoned Angelee Hill, and had Hill pick them up.

Taken in the light most favorable the State, the evidence supports the State's theory. Burrell, the [Petitioner], and Crutcher were in the illegal drug business together, and Burrell knew Crutcher kept his drugs in the Huntsville Highway and Foxwood Drive houses. Several days before the victims' deaths, Burrell told someone that he was going to rob Crutcher. On October 21, 2012, Angelee Hill drove Burrell to the Tractor Supply parking lot in Fayetteville. Burrell had a gun and left the parking lot with the [Petitioner]. D'Carlos Joiner spoke with Crutcher on the telephone between 2:00 and 4:00 p.m. At that time, Crutcher was at the Huntsville Highway house, and Joiner heard Burrell and others in the background. The [Petitioner] later admitted to police that he also was at the home on October 21.

That night, Crutcher, driving the white Elantra, picked up Amber McCaulley at her mother's house in New Market, Alabama. Crutcher and McCaulley then went to Crutcher's mother's home but left in response to a call from Burrell. Telephone records and mapping of cellular telephone towers showed that about 10:30 p.m., Burrell and the [Petitioner] were in Huntsville, Alabama. However, calls made from the [Petitioner's] and Crutcher's telephones at approximately 1:30 a.m. on October 22 showed that they had returned to the area of the Huntsville Highway house. Shortly thereafter, Burrell began using the [Petitioner's] telephone to communicate with Hill. By 2:07 a.m., Burrell and the [Petitioner] had returned to Huntsville, and Burrell was directing Hill to the Overlook Apartments. When Hill picked up Burrell and the [Petitioner] in the early morning hours of October 22, Burrell was wearing gloves, and the [Petitioner] put two long guns on the back seat of Hill's Jeep. Hill later saw blood on the outside of the Jeep where Burrell had opened the back hatch. Hill drove the [Petitioner] and Burrell to the Walmart and the Wavaho, where the [Petitioner] attempted

to use Crutcher's bankcard. They then drove north to the [Petitioner's] home in New Market. As Hill crossed the Flint River, Burrell and the [Petitioner] discarded guns and a gun magazine that were later recovered by police. After leaving the [Petitioner] at his home, Hill and Burrell drove to Fayetteville. During the drive, Burrell threw Crutcher's Glock handgun out the window on Joe Quick Road.

Physical evidence linked the [Petitioner] to the crime scenes on Huntsville Highway and Foxwood Drive. Specifically, bloody shoe prints inside the garage and the living area of the Huntsville Highway house were consistent with the soles of [Petitioner's] red and black Air Jordan shoes, and the [Petitioner's] DNA was on a beer bottle in the garage. The police found the Elantra at the Overlook Apartments where Hill picked up the [Petitioner] and Burrell on October 22. Crutcher's and McCaulley's blood was in the car, the car had been driven though McCaulley's blood in the garage of the Huntsville Highway house, and the [Petitioner] could not be excluded as a contributor of touch DNA found on the car's front interior passenger-side door handle. The police found Crutcher's AK-47s, which he kept at the Foxwood Drive house, in the [Petitioner's] home. In sum, the evidence shows that the [Petitioner] and Burrell intentionally killed the victims as part of their plan to rob Crutcher.

Regarding the [Petitioner's] claim that the evidence fails to show premeditation, Burrell told someone several days before the crimes that he was going to rob Crutcher. On the morning of October 21, Burrell had a gun when he met the [Petitioner] at the Tractor Supply. That afternoon, while Burrell and the [Petitioner] were at the Huntsville Highway house with Crutcher, the [Petitioner] sent text messages in which he stated that he was going to "lick," meaning commit a robbery, and that he was with "da lick," meaning the target of the robbery. On the morning after the killings, the [Petitioner] began sending text messages, stating that he had drugs for sale. Thus, the State established a motive, robbery, for the killings. Burrell and the [Petitioner] used deadly weapons upon the three unarmed women, the crimes were particularly cruel, and all of the victims except Campbell's unborn baby sustained multiple wounds. Burrell and the [Petitioner] disposed of firearms and clothing after the crimes and tried to conceal McCaulley's body by dragging it into the utility room and Crutcher's body by dumping it off a farm road in a wooded area. Thus, the evidence is sufficient to establish premeditation.

Id. at *19-20 (footnote omitted).

After our supreme court denied the Petitioner's application to appeal, the Petitioner filed a timely pro se petition for post-conviction relief, claiming, in pertinent part, that he received the ineffective assistance of trial counsel. The post-conviction court appointed counsel, and counsel filed an amended petition. In the amended petition, the Petitioner claimed that trial counsel was ineffective because he failed to call the following witnesses to testify at trial: Demarcus Travis, Shirley Apex, Heather Warden, Dana Leanne Honea, Stevin Currin, "Junebug," Crystal Kelly, Danny Vines, and Shakeya Archer. The Petitioner also claimed that trial counsel met with him only two times before trial and failed to investigate the case adequately, which resulted in trial counsel being (1) unable to take advantage of Angelee Hill's inconsistent testimony regarding Crutcher's bank card; (2) unable to take advantage of Lillie Burrell's inconsistent testimony regarding the black bag; (3) unable to cross-examine witnesses effectively and impeach Angela Brown;[2] (4) unable to realize the significance of a 911 call; (5) unable to challenge the chain of custody for the rifles found in the Petitioner's Alabama home; (6) unable to link a white vehicle seen at the site of Jeffrey Pope's murder in Alabama to a white car seen near the crime scene in Fayetteville; (7) unable to take advantage of a possible witness discovered during jury voir dire; (8) unable to realize the significance of certain questions the Petitioner wanted trial counsel to ask the State's witnesses; and (9) unable to use information provided by Lussonia Montague "regarding the relationships of all key players."

The Petitioner also claimed in the amended petition that trial counsel was ineffective because he failed to use expert testimony to challenge Ragland's cause of death, the shoe print evidence, and the "idea" that the victims were tortured. Additionally, the Petitioner claimed that trial counsel was ineffective because he failed to suppress evidence that was taken into custody in Alabama and failed to move to suppress the contents of various cellular telephones. Finally, the Petitioner claimed that trial counsel was ineffective because he failed to object to Eugene Nicholas White's testimony; failed to object to Willie Burrell's and Crutcher's text messages; failed to introduce possibly exculpatory evidence revealed in a child's 911 call; and failed to introduce video of a dog on a treadmill, which would have impeached testimony that the Petitioner was alone at the Huntsville Highway house.

At the evidentiary hearing, trial counsel testified for the Petitioner that he was an assistant public defender and was appointed to represent the Petitioner. Prior to working for the public defender's office, trial counsel was in private practice. Trial counsel said that he met with the Petitioner six to ten times before trial and that they talked for ten to twenty hours. Trial counsel and the Petitioner "talked about a lot of stuff." Trial counsel

---

[2] According to the trial transcript, no witness named "Angela Brown" testified at trial.

said that he "followed up on . . . some things" but that "some things [he] could not flesh out." The Petitioner seemed competent and was able to participate in his defense.

Trial counsel testified that he had "a little concern" that the case was going to become a capital murder case. The case was proceeding "at a pretty quick clip" toward trial, and the defense's strategy was "let's not slow it down any." Trial counsel explained, "The thought was if it was not going to be a capital murder case, our best, the defense's best opportunity would be to go into a trial where the State may not be [as] fully prepared as they would like to be[.]" The Petitioner went to trial less than one hundred days after trial counsel was appointed, and trial counsel thought that strategy helped the defense. Trial counsel and the Petitioner had many discussions about postponing the trial, but they had a "meeting of the minds [to] just move this thing forward." Trial counsel said that despite the speed of the case, nothing "blind sided" the defense.

Trial counsel testified that he spoke with the district attorney's office "a number of times" before trial and that "we had some motion practice." Trial counsel met with the assistant district attorney general and copied "reams" of discovery. Trial counsel had time to obtain funding from the Administrative Office of the Courts (AOC) but did not obtain any funding. Trial counsel said he did not see the need to hire independent experts for the shoe print analysis or the victims' autopsies. Regarding the shoe print analysis, the TBI could not say the bloody shoe print came from a particular shoe. Regarding the autopsies, trial counsel "didn't see anything here that required" the help of an independent medical examiner. Trial counsel obtained an ex parte order from the trial court to obtain the TBI's "bench notes." After obtaining the order, trial counsel set up a meeting with the TBI and "talked to all of their people that had anything to do with anything on this case." Trial counsel left the TBI with "a banker box full of everybody's bench notes and handwritten notes and photographs they took," and nothing in the evidence "jumped out" at trial counsel or led him to think he needed independent analysis. Trial counsel said he was "not aware of anything [he] missed that was substantive."

At that point, post-conviction counsel attempted to ask trial counsel about an Alabama magistrate rewriting an affidavit. The State objected, arguing that the issue was not raised in the pro se or amended petitions. The post-conviction court agreed with the State but ruled post-conviction counsel could make an offer of proof of trial counsel's testimony. Post-conviction counsel decided not to pursue the issue. Trial counsel said that he did not seek funding from the AOC to hire Alabama counsel to assist with the case and that he could not think of any issues in which Alabama counsel was needed.

Trial counsel testified that he met with the Petitioner's wife "a couple of different times" at her home in New Market, Alabama. He also went to north Huntsville and met with an "older couple" because they supposedly knew "something about a bag." However,

the couple ended up being "no help at all."  Trial counsel said that he met with other people the Petitioner wanted him to talk with but that trial counsel could not remember their names.  Trial counsel also looked for a pawn shop on Governor's Drive in Huntsville where Hill supposedly pawned a cellular telephone.  Trial counsel looked for the pawn shop two or three times but never found it.  Post-conviction counsel asked if trial counsel subpoenaed the following witnesses to trial:  Heather Warden, Demarcus Travis, Shirley Apex, Dana Honea, Steven Carrington, George "June Bug" Nance, Crystal Kelly, Danny Vines, and Shakia Archer.  Trial counsel did not recall most of those names or how they were related to the case.

Trial counsel testified that Hill was "a handful" at trial.  Trial counsel stated that he cross-examined Hill and that he could not think of anything he failed to ask her.  Trial counsel said that he did not remember talking with Lillie Burrell, who testified at trial about a black bag, but that he talked with the older couple about the black bag before trial.  Trial counsel did not remember the Petitioner's telling him that the Petitioner made a 911 call.  They talked, though, about video on a cellular telephone that showed a dog on a treadmill in the garage of the Huntsville Highway house.  The Petitioner was known to train dogs, so the video would have explained why he was at the house.  Trial counsel said that he did not know if he ever viewed the video but that he thought "it was . . . understood throughout the whole trial" that it was not unusual for the Petitioner to be at the Huntsville Highway house.  Post-conviction counsel asked if trial counsel argued that the Petitioner's DNA was in the home because the Petitioner was "possibly there all the time."  Trial counsel responded, "I thought it was just understood he was there a lot. . . . I guess it never struck me that I need[ed] to drive that point home because I thought it was apparent."

Trial counsel testified that the Petitioner was "engaged" in jury selection, the trial, and "every witness we dealt with."  Trial counsel tried to consult with the Petitioner prior to trial counsel's cross-examination of every witness.  Trial counsel said that he did not remember if he objected to the testimony of a witness named Eugene Nicholas White but that he objected to a police officer being allowed to testify that "shake them down" in a text message referred to committing a robbery.  Trial counsel said that he represented the Petitioner on direct appeal of his convictions and that he raised the issue on appeal.

On cross-examination, trial counsel testified that he became licensed to practice law in 1992 and that he had been practicing law for twenty-five years.  At the time of the evidentiary hearing, trial counsel had been working in the public defender's office for more than four years.  Prior to working in the public defender's office, trial counsel was in private practice.  He said that his practice mostly involved criminal defense and that he had worked on twenty-five to thirty-five capital cases "at some level."  Trial counsel stated that he had tried six capital cases and that he understood very well how the district attorney's office

operated. Trial counsel was "very comfortable" working on the Petitioner's case in Lincoln County.

Trial counsel testified that after he was appointed to the Petitioner's case, he and the Petitioner had a "very long" meeting. Trial counsel said that he met with the Petitioner at least six more times and that they had some "very meaningful strategic meetings about the case." Trial counsel also traveled to Huntsville two or three times. Trial counsel acknowledged that he spent an "entire" day at the district attorney's office and scanned and printed documents. He also met with the assistant district attorney general for the "better part of a day" and talked with her about the State's potential witnesses.

Trial counsel testified that he the Petitioner talked "a lot" during the twelve-day trial and that the Petitioner was "extremely engaged in his case." Trial counsel asked for "Jencks" material after every witness testified, including Hill. Trial counsel objected to an investigator being allowed to testify about "shack them" or "shake them" in a text message, but the trial court overruled the objection. Trial counsel said that he objected during the trial when he thought he needed to object and that he and the State "were fighting the whole time." Trial counsel said he "thought it was apparent" throughout the trial that the Petitioner's DNA was at the Huntsville Highway house because the Petitioner was one of the men who regularly visited the home. Trial counsel said that he vaguely remembered objecting to White's testimony and that the trial court did not allow White to testify.[3] Trial counsel said that "[t]here is no such thing as a perfect trial" but that he could not think of any material issue he "missed."

The Petitioner testified that trial counsel should have tried to suppress the Petitioner's cellular telephone records because an officer claimed at trial that the officer received the records on April 1, 2013, but a search warrant for the records was not issued until May 9, 2013.[4] Trial counsel also should have shown that the cellular telephone

---

[3] Our review of the trial transcript confirms that trial counsel objected to White's testifying about a previous robbery allegedly committed by the Petitioner. The trial court held a jury-out hearing and ruled that White could not testify.

[4] The State objected to the Petitioner's testifying about this issue, arguing that "[t]here is nothing in the petition about any cell phone records." The post-conviction court agreed with the State but said it was "trying to be liberal with this" and allowed post-conviction counsel to make an offer of proof of the Petitioner's testimony. Throughout the Petitioner's testimony, the State frequently objected on the basis that his testimony addressed issues that were not specifically raised in the petition. The State asserted that if the issues had been raised properly, "I would have . . . gone through the transcript and pulled all that out and been able to have a response." The post-conviction court agreed with the State but continued to allow post-conviction counsel to make offers of proof of the Petitioner's testimony. We note that post-conviction counsel never asked to amend the petition. See Tenn. Sup. Ct. R. 28, § 8(D)(5) (providing that "[i]f evidence is objected to on the basis that it concerns issues not raised in the answer, the court may allow

purported to be the Petitioner's telephone belonged to someone else. The Petitioner said the trial court ruled that a TBI agent could testify about the "percentage of likelihood" that the Petitioner's Air Jordan shoe made the bloody shoe print in the Huntsville Highway house. Instead, the agent testified that the Petitioner's shoe "could" have made the shoe print. Trial counsel should have objected to the agent's improper testimony.

The Petitioner testified that trial counsel should have challenged the chain of custody for two rifles found in the Petitioner's Alabama home that were ultimately obtained by the TBI. If the trial court had suppressed the rifle evidence, the State would have been unable to argue that the Petitioner robbed the victims for the rifles. Regarding Hill's testimony, Hill testified that she saw Warren Crutcher's bank card and that the Petitioner threw guns out of the window of her Jeep. According to the Petitioner, the Jeep's interior lights did not work, and the Jeep's windows would not roll down. Trial counsel could have used those facts at trial to discredit Hill.

The Petitioner testified that trial counsel should have called Shakia Archer to testify at trial because Archer, who babysat in the Petitioner's home, could have testified that the police lied in order to gain access to the Petitioner's residence and search the residence prior to the Petitioner's arrest. The Petitioner said that Crutcher's best friend, Jeffrey Pope, was murdered in Huntsville the day after the victims were murdered and that the police thought the two cases were "linked, the same people did it all." However, the Petitioner was at home when Pope was killed and was not a suspect in Pope's death. The Petitioner said that the police suspected Crutcher and Henry Burrell of killing Pope and that trial counsel should have presented that evidence at trial to show the Petitioner did not kill the victims. At trial, Lillie Burrell claimed she saw the Petitioner with a black bag in the back of Hill's Jeep, but Hill testified that the Petitioner did not have a black bag. The Petitioner asked trial counsel to "address that" at trial, but trial counsel did not address the discrepancies in their testimony. The Petitioner said that Willie Bass was at Lillie Burrell's apartment the day after the crimes and that Bass also could have testified that the Petitioner did not have a black bag. The Petitioner told trial counsel about Bass, but trial counsel never contacted Bass. The Petitioner said that Bass was "WB" and that Bass could have testified at trial about the meaning of the phrase "shack them."

The Petitioner testified that crime scene photographs of the Huntsville Highway house showed a lot of blood in the home but that the video footage from Walmart and the Wavaho gas station did not show any blood on the Petitioner's clothes. Trial counsel should have had Shirley Apex, who was the landlord of the Huntsville Highway house, testify at trial because Apex saw some people at the house but could not identify the

---

amendments and shall do so freely when the presentation of the merits of the cause will otherwise be subserved").

Petitioner in a lineup. The Petitioner said that although the medical examiner testified that Ragland died of blunt force trauma, the State argued Ragland was "stomped." Moreover, although the medical examiner said Brown's injuries "would give the appearance" that Brown was tortured, the State argued that Brown was tortured. Trial counsel did not object to the State's mischaracterization of the medical examiner's testimony. Trial counsel also did not have a bloody "footprint" found next to Ragland analyzed to determine whether the blood came from the child or a possible suspect.

The Petitioner testified that Demarcus Travis knew Henry Burrell's whereabouts on the weekend of the killings and that Travis knew who was involved in Pope's murder. The Petitioner said that Travis "would have shed a lot of light on the peoples [sic] involved in the whole situation" but that trial counsel failed to subpoena Travis. Trial counsel also should have introduced into evidence a "bloody Owe List" that was found at the crime scene because the list would have shown that Burrell had "issues" with Crutcher about money and had a motive to kill Crutcher. The Petitioner said that trial counsel should have had clothing found around Brown's infant son in the Foxwood Drive house tested for a suspect's DNA and that trial counsel should have had fingerprints found in the house "routinely check[ed]" in a law enforcement database for a possible match. Trial counsel also should have challenged the chain of custody for "a large cookie of cocaine" that was found in the Foxwood Drive house two weeks after the crimes.

The Petitioner testified that a police officer said at trial that the Petitioner was unemployed at the time of the killings, which gave the jury the impression that the Petitioner committed the murders. However, the Petitioner had two jobs at the time of the murders, and his parole officer could have testified about his employment. Moreover, a "thorough look" into the GPS information for the cellular telephones related to this case would have shown where Henry Burrell went and the people he was with after the murders. Such evidence would have contradicted Hill's testimony and would have shown that Hill was not truthful.

On cross-examination, the Petitioner testified that the cellular telephone purported to be his telephone actually belonged to Crutcher. Regarding the TBI agent's testimony about the bloody shoe print, trial counsel "should have pointed out specifically what the Judge wanted [the agent] to address." Trial counsel also should have challenged the police taking items out of the Petitioner's home without a warrant. The Petitioner acknowledged, though, that the police found the two rifles in his home pursuant to a valid search warrant. The Petitioner said trial counsel should have tried to impeach Hill because it was too dark in her Jeep to see the name on the bank card and because the windows in her Jeep could not be rolled down. The Petitioner said he was at home at the time of Pope's death and was never questioned about Pope's murder. He acknowledged that if Crutcher was dead when Pope was killed, Crutcher could not have killed Pope. The Petitioner said that a

"female friend" dropped him off at the apartment complex on the night of the victims' deaths and that he did not know how the white Elantra ended up in the apartment complex. He said that "more people" must have been involved in the victim's deaths and driven the car there and that trial counsel should have used that information to show the Petitioner was not involved in the crimes. Trial counsel also should have discredited Lillie Burrell's testimony about the black bag because Hill said the Petitioner did not have a bag. Trial counsel should have had Willie Bass, "WB," testify because Bass would have testified that "the lick" was "a white guy," not Crutcher. Trial counsel also should have talked to the clerks at the Walmart and the Wavaho gas station about blood not being on the Petitioner's clothes.

The Petitioner testified that trial counsel should have called Apex to testify because Apex was at the Huntsville Highway house on the afternoon of the murders and could have testified about what she did and did not see that day. According to the Petitioner, the State claimed that Ragland was "stomped," but the medical examiner refused to agree with that terminology and would only say that Ragland died of "blunt force trauma."[5] The Petitioner said trial counsel claimed he interviewed Demarcus Travis. However, trial counsel did not call Travis, who was the Petitioner's neighbor, to testify. The Petitioner said that Henry Burrell's name was on the "Owe List" and that the list would have demonstrated that Burrell had a motive to kill Crutcher. The Petitioner acknowledged that testimony about the "cookie of cocaine" may have occurred at the Petitioner's sentencing hearing, not trial. The Petitioner stated that GPS information from his cellular telephone was never presented at trial but acknowledged that Henry Burrell was with him on the night of the crimes.

At the conclusion of the hearing, post-conviction counsel argued that although the Petitioner did not present any evidence at the hearing to show he did not commit the murders, "what we do have to offer is many, many different tiny holes poked in the State's [case]." The post-conviction court filed a written order denying the petition for post-conviction relief. Initially, the post-conviction court noted that the Petitioner testified about "a number of issues" at the evidentiary hearing that were not raised in his petition for post-conviction relief but that were "covered" by offers of proof. The post-conviction court found that the Petitioner's testimony regarding those issues did not demonstrate ineffective assistance of trial counsel. Regarding the issues raised in the petition, the trial court ruled that the Petitioner also failed to demonstrate that he received the ineffective assistance of trial counsel.

## II. Analysis

---

[5] Our review of the trial transcript contradicts the Petitioner's testimony. The State asked the medical examiner if Ragland's injuries were consistent with "a stomping," and he answered, "Consistent with a stomping, yes."

The Petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief. The Petitioner does not address any of the issues raised in his petition or raised in the offers of proof at the evidentiary hearing. Instead, he argues that this court should remand this case to the post-conviction court so that he can present additional evidence in support of his petition. Specifically, the Petitioner asserts that the case should be remanded "to present any of the witnesses he identified at the hearing or tests of any items he identified at the hearing so that the post-conviction court may make a proper finding as to whether failure to present this evidence prejudiced [the Petitioner]." The State argues that the Petitioner failed to establish any facts that would entitle him to post-conviction relief and that the case should not be remanded. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

- 14 -

[b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Here, the Petitioner raised numerous issues in his pro se and amended petitions as to why trial counsel was ineffective. He also testified to a "laundry list" of complaints at the evidentiary hearing. Most of the Petitioner's claims related to trial counsel's failure to present witnesses and evidence at trial and trial counsel's failure to have scientific evidence independently analyzed. However, the Petitioner did not present any of the witnesses at the hearing. See Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). He also did not present any scientific evidence at the hearing, did not ask for a continuance, and failed to question trial counsel about many of the issues.

In support of the Petitioner's claim that we should remand this case so that he can present those witnesses and test results, the Petitioner relies on State v. Jeffrey A. Simmons, No. M2012-01223-CCA-R3-CD, 2013 WL 5964013 (Tenn. Crim. App. at Nashville, Nov. 6, 2013); Aldrick D. Lillard v. State, No. M2011-01380-CCA-R3-PC, 2012 WL 4479275, at *17 (Tenn. Crim. App. at Nashville, Sept. 27, 2012); and Marcellous Bond v. State, No. 02C01-9412-CC-00274, 1995 WL 334368 (Tenn. Crim. App. at Jackson, June 7, 1995). As noted by the Petitioner, though, all of those cases are factually distinguishable from the present case. In Jeffrey A. Simmons, this court remanded the case to the trial court because the trial court's summary dismissal of the petition for post-conviction relief "precluded" the petitioner from presenting proof in support of his claim of ineffective assistance of counsel. No. M2012-01223-CCA-R3-CD, 2013 WL 5964013, at *13. In Aldrick D. Lillard, this court found that the post-conviction court erred by not allowing the petitioner to amend his petition during the evidentiary hearing and, therefore, remanded the case to the post-conviction court so that the petitioner could amend his petition and present evidence regarding the omitted issue. No. M2011-01380-CCA-R3-PC, 2012 WL 4479275, at *17. Finally, in Marcellous Bond, this court remanded the petitioner's case to the post-conviction court because the court dismissed the petition without having the trial transcript to review and without trial counsel testifying at the evidentiary hearing. No. 02C01-9412-CC-00274, 1995 WL 334368, at *2. None of those circumstances exist in this case.

Moreover, a petitioner who has received a "full and fair" post-conviction hearing is not entitled to a second hearing. See Corey Mitchell v. State, No. W2016-01818-CCA-R3-PC, 2018 WL 3005379, at *5 (Tenn. Crim. App. at Jackson, June 14, 2018). Our

supreme court has held that a petitioner was afforded a "full and fair" hearing when an evidentiary hearing was held, the petitioner was afforded every opportunity to present evidence and argument at the hearing, the trial record was introduced into evidence, and "the trial judge determined from that record and the argument of counsel, that the allegations were without merit." House v. State, 911 S.W.2d 705, 711 (Tenn. 1995). In this case, the post-conviction court held an evidentiary hearing, and the Petitioner was afforded every opportunity to present evidence and argument at that hearing. Although the post-conviction court ruled numerous times that the Petitioner was testifying about an issue that was not included in the petition, the court allowed the Petitioner to address every issue in an offer of proof. The trial record was introduced into evidence, and the post-conviction court found that the issues raised, including the issues raised in the offers of proof, did not demonstrate that the Petitioner received the ineffective assistance of trial counsel. The Petitioner received a full and fair hearing on his petition for post-conviction relief. Accordingly, we conclude that remanding the case to the post-conviction court for a second evidentiary hearing is not warranted and that the post-conviction court's denial of the petition must be affirmed.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE